This appeal is from an order of the Superior Court[1] reversing an order of the Common Pleas which had affirmed the action of a school board in discharging a teacher.
On her appeal to the Common Pleas the teacher requested and obtained a hearing de novo[2] as permitted by section 1205(j) of the Act of April 6, 1937, P. L. 213, 24 PS section 1126(j), amending the School Code. Paragraph (j) contains the following: "Upon the hearing of said petition, the court shall make whatever order it considers just, either affirming or reversing the action of the board of school directors, and stating plainly whether the professional employe is to be discharged, refused reëlection or is to be retained."
The difference of view between the two learned courts which have considered the case, arises from a different construction of the following provision in section *Page 371 
1205(a), 24 PS section 1126(a): "(a) The only valid causes for termination of a contract in accordance with the provisions of this section shall be — Immorality, incompetency, intemperance, cruelty, wilful and persistent negligence, mental derangement, persistent and wilful violation of the school laws of this Commonwealth on the part of the professional employe, . . ."
All the members of this court agree that the Superior Court's construction is much narrower than was apparently intended by the legislature; we also think the case calls for the application of the rule that findings of fact supported by competent evidence must be accepted on appeal. In the opinion of the Superior Court it is said — "It may be true, as counsel for appellee [the school board] argues, that appellant [teacher] now commands neither the respect nor the good will of the community, but these are not matters which the statute now recognizes as causes for dismissal." If the fact be that she "now commands neither the respect nor the good will of the community" and if the record shows that effect to be the result of her conduct within the clause quoted, it will be conclusive evidence of incompetency. It has always been the recognized duty of the teacher to conduct himself in such way as to command the respect and good will of the community, though one result of the choice of a teacher's vocation may be to deprive him of the same freedom of action enjoyed by persons in other vocations. Educators have always regarded the example set by the teacher as of great importance, particularly in the education of the children in the lower grades such as those attending the school in which this teacher had been employed; it was a country school with eighteen pupils classifying into eight grades.
Difficulties between this teacher and the board had been existing some time and grew out of her conduct with respect to a restaurant maintained by a man whom she married in August, 1936, during the course of the *Page 372 
period involved. In this restaurant beer was sold and a pin-ball and a slot machine were maintained and dice were played. The restaurant was across the road and about one hundred and twenty five feet from the school. In the opinion filed by the learned trial judge, he said: "The evidence in the case is that: (1) While Miss Horosko used and was known by the name of Evelyn Horosko she was in fact married to one William Connors[3] and lived with him as his wife; (2) That the said Connors[3] was the proprietor of a lunch room and beer garden in which Evelyn Horosko acted as waitress and, on occasion, as bartender, such services being performed after school hours and during the summer vacation; (3) That in this beer garden and in the presence of several of her pupils whom she was tutoring, she (a) took an occasional drink of beer; (b) served beer to customers; (c) shook dice with customers for drinks; (d) played, and showed customers how to play a pin-ball machine on the premises. And further, that she was rated by A. H. Howell, County Superintendent of Schools, under the rating card provided by the Department of Education, as 43% competent, a rating of 50% being the 'passing' or average rating.
"Is such a course of conduct immoral or intemperate, and does it — in connection with her scholastic and efficiency rating — amount to incompetency? We hold it to be self evident that, under the intent and meaning of the act, immorality is not essentially confined to a deviation from sex morality; it may be such a course of conduct as offends the morals of the community and is a bad example to the youth whose ideals a teacher is supposed to foster and to elevate. Nor need intemperance be confined strictly to overindulgence in alcoholic liquors — temperance implies moderation, and a person may be intemperate in conduct without being an *Page 373 
alcoholic addict. And so as to incompetency; as we take it, this means under the Act incompetency as a teacher — but does this mean that competency is merely the ability to teach the 'Three R's'?" He concluded that it would be "just" (the word used in clause (j) of section 1205) to affirm the action of the school board in dismissing the teacher.
The opinion of the Superior Court is based, as we understand it, on a narrower construction of the word "incompetency" than that adopted by the trial court. The Statutory Construction Act of 1937, P. L. 1019, in section 33, 46 PS section 533, provides: "Words and phrases shall be construed according to rules of grammar and according to their common and approved usage; but technical words and phrases and such others as have acquired a peculiar and appropriate meaning or are defined in this act, shall be construed according to such peculiar and appropriate meaning or definition.
"General words shall be construed to take their meaning and be restricted by preceding particular words."
The provisions of clause (a) which include the words "incompetency" and "immorality", are therefore to be construed "according to their common and approved usage", having regard, of course, to the context in which the legislature used them.
Among the definitions of "immorality" is "conduct inconsistent with moral rectitude."[4] A large body of public opinion regards gambling as immoral. Gambling with a pin-ball or a slot machine,[5] or with dice is prohibited *Page 374 
by law. We are not prepared to say the learned judge erred in concluding that the teacher's shaking "dice with customers for drinks"[6] and showing them how to play a pin-ball machine in the presence of school children, supported the finding of incompetency[7] in the circumstances shown.
The term "incompetency" has a "common and approved usage". The context does not limit the meaning of the word to lack of substantive knowledge of the subjects to be taught. Common and approved usage give a much wider meaning. For example, in 31 C. J., with reference to a number of supporting decisions, it is defined: "A relative term without technical meaning. It may be employed as meaning disqualification; inability; *Page 375 
incapacity; lack of ability, legal qualifications, or fitness to discharge the required duty." In Black's Law Dictionary (3rd edition) page 945, and in Bouvier's Law Dictionary, (3rd revision) p. 1528, it is defined as "Lack of ability or fitness to discharge the required duty." Cases construing the word to the same effect are found in Words and Phrases, 1st series, page 3510, and 2nd series, page 1013. Webster's New International Dictionary defines it as "want of physical, intellectual, or moral ability; insufficiency; inadequacy; specif., want of legal qualifications or fitness." Funk 
Wagnalls Standard Dictionary defines it as "General lack of capacity of fitness, or lack of the special qualities required for a particular purpose."
In the circumstances, therefore, we must conclude that the order made in the Common Pleas was "just".
The order of the Superior Court is reversed and that of the Common Pleas is reinstated; each party to bear its own costs.
[1] The case is fully stated in the opinion reported in 135 Pa. Super. 102.
[2] As the hearing was de novo it is now unnecessary to deal with objections made to the procedure before the school board.
[3] We assume this is a misprint for John Kearney, the name of her husband.
[4] Funk Wagnalls Standard Dictionary.
[5] A witness testified as follows: "Q. What, if anything, did you see Miss Horosko do with relation to this slot machine? Mr. Reedy: We object to that as irrelevant and immaterial. The Court: Objection overruled, with exception. Mr. Reedy: Answer the question. A. Well, she showed us how to put the nickels into the slot machine and how the machine paid for itself. Q. Were the school children present when this was done? A. Yes."
The record shows that November 12, 1936, a warrant issued for Kearney's arrest on the oath of a constable charging that he did "possess, promote or encourage a game or device of address or hazard, namely: 1 King Six Jr. 5¢ — 25¢ dice game and 1 'Bally' Pin-Ball Machine at which money or other valuable things were betted upon, staked, striven for, won or lost . . ." and that on December 24, 1936, Kearney pleaded guilty and paid a fine of $14.00. The evidence of this conviction, the learned trial judge said, he disregarded; when offered, it was received as affecting the teacher's credibility.
[6] A witness testified: "Q. Whether or not there were any games played in this establishment, Mr. Flynn? A. Yes, sir. Mr. Reedy: Objected to as irrelevant and immaterial and the witness having answered we ask that the answer be stricken out. The Court: Objection overruled, with exception. Q. What was the nature of the games played? Mr. Reedy: We object to that too. The Court: Same ruling. A. Shaking dice. Q. Did you ever see Miss Horosko shake dice during this period? A. I have. Q. Ever shake dice with her? A. I have. Q. For what? A. Drinks."
[7] She testified that she never gambled but that "The only machine I know was in there was one of these pin-ball machines or amusement machines. Q. Were there any prizes offered for playing that? A. No, not the one I saw there. Q. Was it one of skill? A. Well, it was more of skill; amusement. Q. Did you ever play that in the presence of Mrs. Carley or anybody else? A. I don't believe I did in her presence. Q. You recall Mrs. Carley testifying you showed her how to play it. Do you recall doing that? A. No, I do not. Q. If such a thing did occur was it played for money or anything of that kind? A. No."